Case number 22-5486 and 22-5605, U.S.A. v. Peter Bolos, Argument not to exceed 15 minutes per side. Mr. Smith, you may proceed for the appellant. May it please the Court, I reserve four minutes for rebuttal. Last term in Seminelli, the Supreme Court held that depriving a victim of accurate information in an economic exchange is not a federal felony. In so ruling, the Court followed this Court's rule in Sadler. Lying that your patients are indigent but paying the asking price for their pills is not federal mail or wire fraud. The same is true here. Dr. Bolos filled real doctor's orders with real prescriptions for real patients who had real pain like migraines or rheumatoid arthritis. The only thing that Dr. Bolos allegedly deprived the pharmacy benefit manager of was information about his business compliance and under Seminelli and Sadler, that is insufficient to sustain his federal convictions. There is a little bit more, I think, going on here and I'm not saying that Sadler and Seminelli aren't issues. It seems to me we've got this kind of age old debate about what is a breach of contract, what's a fraud, right? And it looks to me like the breach of what we've said is, and what the courts have said is, look, to be a fraud, you've got to have a deceptive act, okay? Not just a regular breach of contract. And there's got to be, the deceptive act has to go to some, the nature of the bargain, something material about the bargain, right? So the idea in Sadler was the fact that she was deceptive about what was going to happen downstream wasn't enough. Here, I think the allegation is a little more serious, right? I mean, there are doctors, there are doctors who are not seeing patients, we've got some issues with the co-pays, I mean, it seems like there's deception and I think the question is, is it going to the nature of the bargain? And I take it your answer is no, but I'm struggling to see how this is Sadler. This seems to be a little bit more than Sadler. So to divide the cases up, I think you look at the language of the statute which requires a scheme to defraud. And this court in Harrison defined that as either a money for nothing or a something for nothing case. So a scheme for defraud is to sell someone something for nothing, whereas, by contrast, if you have a plan or program to buy or sell something, but when you ultimately get to the end of that exchange, it's an exchange for value, that is not mail fraud. So the best examples of that... Do you think that we have plenty of cases, for example, that are insurance fraud cases, that are mail fraud? For example, arson. Let's say I burn my own house down. Is that a mail fraud? Assume I mailed in the request. I mean, we have cases that say that, right? I mean, the house did burn down. The insurance company did pay me the money to replace the house. It just so happens that it was fraudulent because I was deceptive about the nature of the bargain. Because at the heart of that, you have deprived the insurance company of the most important information, which is that they have a covered loss as opposed to something that the policyholder itself did. And so, if you have an offer, an acceptance, and in the middle of that, there's no consideration, it's a void, that's a fraud. Are you saying that Dr. Bellows didn't deprive the PBMs of information, such as whether these individuals were being seen by doctors, things of that nature? I'm not saying that, Your Honor. I'm saying that all of that is information about business compliance, and that's not sufficient to satisfy the mail and wire fraud statutes. All he had was a plan to sell. So, in Harrison, you have a vacuum. How is this case different than the example that Judge Nalbanian just gave about the arson? Well, inherent in that exchange is the policyholder saying that they had a covered loss, and if the policyholder caused that covered loss, and is trying to get someone to pay for an arson that they themselves set, at the center of that, at the heart of that exchange, is a lie, is a fraud. But here, you have a real product being filled on a real doctor's orders, and all he was doing was trying to stay on plan. And so, all he deprived the PBMs of was accurate information about business compliance. And so, he wanted to stay on plan, but what he sold them was a real, I'm sorry, Your Honor. Do you think that it's, and I'm sorry to interrupt.  That are being reimbursed for being medically necessary? There is no issue in this case about medical necessity. Judge Greer makes it clear in his post-judgment ruling that this is not a medical necessity case. And at the beginning of the government's case... But do you think that that's something that the PBMs are assuming is there when they're reimbursing? That they're not just reimbursing someone prescriptions that are being written simply to write prescriptions and make money that way, but they're actual patients that are medically need these prescriptions? These are real patients with real pain who reached out on their own to try to find a non-narcotic solution to their pain. But the government's theory was that they talked to these health advocates, they're doctors, doctors never really have a doctor-patient relationship. You know, this went to trial, we have to assume that that's true, right? Or at least in the light most favorable to the government. If this was a case about medical necessity, it would be against the doctors. That's upstream from the pharmacist. But the fact remains that the Tennessee and Florida statutes permit asynchronous store-and-forward technological exchanges between a patient and a doctor and that's super common in this day and age post-COVID where people are getting their hair supplements or ED or birth control from a mail-order pharmacy. There's nothing illegal about that and there's no proof in this case whatsoever that these were not effective drugs. The trial judge made it clear at the beginning of the government's case that there had been an agreement between parties that there was not going to be any evidence that these were not effective. I mean, this is prescription-strength Voltaren, which if you have rheumatoid arthritis is very effective, topical for your hand pain or your joint pain, but it's not narcotic. It's not, you're not going to become addicted to it. And this was real pain that these patients had and it was filled by a prescriber. It's not a medical necessity case. How did they get involved with your client? How did that start with somebody on the street who says, I've got pain? The record shows that Blue Cross Blue Shield and the PBMs turned the Synergy Pharmacy into the government is my understanding of how this began, the investigation. It was a large indictment, hub and spoke, that involves other pharmacies that were filling aluminum tubes with hand lotion and selling that. That's not what my client was responsible for. My client filled real orders for real patients with real drugs and there was no proof about effectiveness or medical necessity. And so at most, it's business compliance. Back to your question, Judge Mathis, and the Supreme Court in Cleveland makes it clear that if the victim is responsible for issues of allocation, exclusion, and control, that is not property. And that's what Justice Ginsburg's opinion says in Cleveland. And here the PBMs are only concerned about excluding pharmacists that are not on plan, controlling those that are on plan with these multi-page PBM manuals. And so it really is just a regulatory compliance case. There's a Tennessee statute. So you're saying that as long as somebody somewhere is getting a drug, it doesn't matter to the PBMs. They don't care. They just reimburse. They wouldn't feel like they were deprived of property. They wouldn't testify in court that they were deprived of property because I think they did, didn't they? Well, they testified that he violated their PBM manuals. But they have regulatory ways to fix that under state regulatory law. They have contracts. They can recoup monies that they investigate in arrears. They can cancel someone's contract. That ultimately happened here with Synergy. So that's a regulatory violation. And our theory is that this is an over-criminalization of what should be governed by. Do you agree that there was something deceitful? That your client was deceitful with the PBMs about what was going on? So as I said, yes, we agree that there was a deprivation of business compliance information. But that there was a. They were deceptive, but it didn't go to the whatever the heart of the bargain requirement is. Deprive them of information. It's just like Simonelli and Sadler. I mean, Tackle-Off, Judge Tapar's opinion in Tackle-Off is about a bar that uses Russian models to bring someone into. That opinion says, look, if you're not getting the product that you bargained for, that's a problem. It uses the example of substituting a cheaper whiskey for a premium whiskey. And we don't have that here. That's the question about medical necessity, right? The bargain is that I'm providing a drug that is needed by this patient. And the government's theory is it really wasn't. It was just to gin up prescriptions. And I understand that the case isn't technically a medical necessity case in the way that some of these other cases are planned as health care fraud. But that still seems to me to be implicit in whatever this bargain is. That I'm not just writing prescriptions. There are people coming in, seeing a doctor. A doctor says, yes, this is your problem. Here's the prescription. You need this. Reimburse. You can listen to the phone calls with all of the patients. They're all in the record. And you can make up your own mind. But it's clear that these patients reached out for a non-narcotic problem for their pain. This is how it started. There's somebody on the street that says, I've got a terrible pain in my back. And then what does he do to reach your client? Well, in the 21st century, it's just like the advertisements on television you see for pharmaceuticals. It's a means of getting information out. And that information was put out through HealthRight on the internet. And the patients then reach out affirmatively. They fill out a survey on their own. And then someone calls them when they ask for someone to get in touch with them. So it's just a program. And it initiates it based on something that's on TV? On the internet, yes, Your Honor. And it's just like the pharmaceutical commercials. But there's nothing that has been deprived other than accurate information about business compliance. And if you look at the indictment, the five things that are listed are about prescription brokering. And HealthRight was a safe, harbored contract under federal law. That's a management contract. You have doctor-patient relationships. He's not a doctor. He's not in the room with these patients. That's upstream of him. You've got the Tennessee license. And Cleveland says that's not mail fraud. You have co-pays. That's not money that goes to the PBMs. And it's clear from the record that the pharmacy knew nothing about the amount of the co-pay at the time that it was adjudicated. Okay. All right. Thank you, Counselor. You've got your rebuttal time. Thank you, Your Honor. May it please the Court. My name is Brian Samuelson, and I represent the United States. There was ample evidence to support the jury's verdict in this case. That verdict is entitled to deference, and the Court should not second-guess it now. I'd like to make a couple points about the nature of the scheme at issue here. The first point is that the object of the scheme was money. The PBMs were paying Synergy money, and Synergy's scheme was to get more of that money by lying and concealing material facts from the PBMs. How does Simonelli impact this case from your point of view? Simonelli indicates that intangible property rights are not covered by the fraud statutes, but that's not what we have here. Here we have the PBMs paying cash, paying money to the defendant and the pharmacies based on lies and omissions, and money is explicitly covered by the wire fraud statute. What's your best case to show that this, in fact, is a crime? Do you have that in the Sixth Circuit or some other place? Yes, Your Honor. I think this case is closely analogous to cases like Bertram, in which medical providers billed for diagnostic tests that did not turn out to be useful. There were real doctors ordering real tests. So is this a medical necessity case or not? It is not a case about the effectiveness of the medications. It is a case about whether those medications were prescribed in the course of doctor-patient relationships, about whether patients were willing to pay for those medications, about how those medications were generated, i.e., whether they were paid for. All of those are material to this bargain. But at the end of the day, I mean, I guess the question is, does it go to the heart of the bargain or not? Somebody prescribed a drug. It was prescribed. It was reimbursed. I mean, that's what the insurance companies agreed to, right? Why does it not just breach a contract then? Well, a couple of points, Your Honor. First, the PBMs did not get what they paid for here. They were lied to about the nature and value of the thing that they were receiving. Drugs have no inherent value to the PBMs. The PBMs can't use drugs. They don't receive drugs. The drugs themselves are not what is valuable. What the PBMs want is to discharge their obligations to the insurers. Their interest is to provide covered care to patients. And that means what they think they are paying for is to cover reimbursable prescriptions. That means prescriptions for which a patient is willing to pay a copay, prescriptions that are written in the course of a valid doctor-patient relationship, prescriptions that have not been paid for to be generated by a telemarketing firm. All of those go to the nature of the thing being purchased or the thing the PBMs think they're being purchased. It's exactly like an insurance company paying an arson claim and being lied to about whether that's a covered claim. So you're saying that implicit in the idea of the reimbursement for the prescription is that it's like a bona fide prescription? Absolutely. Like Webb, the old Supreme Court case at Webb, the 1919 case, implicit in prescription is that it's somehow bona fide, right? Yes, Your Honor. And the jury heard lots of evidence that these were material terms. Witnesses testified that they would not have paid Synergy if they knew these facts. But that's getting close to Sadler, right? The kind of the but-for is not enough, right? I mean, because in Sadler, the upstream supplier would not have – if she had said, hey, I'm going to take these pills and I'm going to sell them at my pain clinic, they would have said, okay, that's a no-go. So that's clearly not enough, right? I mean, what's enough is the deceitful act, which I think we all agree we have deception, and then whatever it is that goes to the quote-unquote nature of the bargain, I guess. The actual whatever the exchange is. And from what I can tell, it's not sufficient to say, but for this, the transaction wouldn't have happened because Sadler tells us that's not enough. So what is it? Yes, Your Honor, and the cases draw a line between lies about sort of the reason or the reason a party may enter a contract and lies about the nature or the value of the thing being exchanged. So in Sadler, the lie was what the drugs were going to be used for, whether they were going to be used for indigent patients, the name of the person requesting the drug. Those things didn't affect the value of the drugs being sold. They didn't affect the value of the cash being received. Those lies didn't go to the value of the thing being exchanged. What makes this a federal crime? Is it the fact that a person orders this up off the Internet, or is it the fact that this company was making so much money, or no patient-doctor relationship, or is there something I've missed? It's fraud because there are material lies and misrepresentations, and there is an intent to defraud. That's what elevates this above a simple breach of contract. It falls within the ambit of federal statutes because they used wires and mail to accomplish their scheme, which is where jurisdiction comes from. And so this case is much closer to those cases where the lies have gone to the actual value of the thing being exchanged. Cases like Bertram, where the insurance company was billed for a diagnostic test, but wasn't told that the test was... Is there a difference between the cases that are brought as quote-unquote healthcare fraud cases and the ones that are mail and wire fraud cases? No, Your Honor. I think the fraud statutes, what is fraud within the meaning of the statute is consistent between the wire fraud, the mail fraud, and the healthcare fraud statutes. Is there a reason why this one was mainly brought as a wire fraud or mail fraud case? Well, the substantive counts were brought as wire fraud and the conspiracy was brought as healthcare fraud. Why that charging decision was made I have no information on. Whether the act was deceptive and whether those lies were material is consistent between those counts. When does the fraud occur? When the patient gets a prescription or when the patient asks for a prescription or is there some other place? Well, here there was an ongoing scheme to defraud and there was an ongoing conspiracy to defraud. The material lies and misrepresentations occur as an ongoing matter. It occurs when the pharmacy does not tell the PBMs that they are not collecting copays, that there are no doctor-patient relationships. It also occurs when they make affirmative lies, when they tell the PBMs that they don't have relationships with Health Right, when they doctor evidence to show that they are collecting copays. So the fraud was an ongoing and continuous matter. Why does the copay go to the heart of the bargain? I understand that you want a copay that shows the patient has skin in the game. It essentially is kind of a proxy for necessity because then you would really need it. Does that really go to the nature of the bargain though? Yes, Your Honor, it does. The PBMs think that they are paying for reimbursable prescriptions that are generated in the normal course of a doctor-patient relationship. And part of that is the fact that the patient is willing to pay a copay for this product. The copay requirement is designed to prevent exactly what happened here, which is that over the course of a few years, a pharmacy bills $65 million for essentially lidocaine cream that patients in large part didn't ask for, didn't want, and in many cases didn't use. So it is material to the PBMs. And the jury was certainly entitled to find that it was material. It heard evidence. It heard witnesses that said this is a material fact. And we also know that it's material based on the fact that Synergy and the defendants went to such lengths to conceal the fact that they weren't collecting copays. They engineered schemes to make it look like patients were, but those funds really came from Synergy itself. So absolutely there was sufficient evidence for the jury to find that lack of copay collection was a material fact in this case. In short, the PBMs did not get what they bargained for. They were lied to about a material fact that went to the heart of the matter, and that is fraud. There's plenty of evidence to support the fraud convictions in this case, and I urge you to affirm. Is there any case that's a lot like this from the Sixth Circuit? Yes, Your Honor. There are several. I think the Bertram case is one. There are several others as well. In Anderson, insurers were billed for medications that were not necessary. That was a fraud. In Persaud, a cardiologist billed for stenting procedures that were not medically necessary. That was a fraud. In Hunt, there were claims submitted for tests for patients that doctors had never seen and had not been determined by a doctor to be required. That was a fraud. In all of those cases, an insurer agreed to pay for those things, but was lied to or not told about material facts about why those things were covered. Those were all frauds. You're saying this case is essentially a medical necessity case. The reason that the lies here were material is a little bit different. The reason the lies here are material goes to a very similar point, which is that the PBMs were led to believe that these were covered expenses when they were not.  Can you address the felony misbranding conviction and why that requires a valid prescription? When there's not a valid prescription, there's a violation of that statute. Yes, Your Honor. Section 353B applies to medications that are not safe for use except under the supervision of a practitioner. That phrase, supervision of a practitioner, implies a doctor-patient relationship. Without a doctor-patient relationship, you would not have supervision of a practitioner. So if there is no requirement that the prescription be valid, that would be a self-defeating statute. I will note that the jury instructions included the fact that a drug may be misbranded if it is distributed without a valid prescription. And in fact, the defendants submitted that requirement in their own proposed jury instructions. So I think that was a reasonable reading of the statute to those involved in this case, and certainly the defendant was on notice that that was a requirement in the statute. Walk me through where the fraud gets initiated. You have somebody on the Internet, and he thinks he's got a heart problem, and so he makes a call or goes through the Internet to get some kind of a prescription. Is that what he did? The patients were sucked into the scheme through telemarketing. So they would see deceptive ads online. They would click on those ads, fill out some information, and they would be contacted by a telemarketer who would tell them that they had qualified for a doctor's consultation. So that was what HealthRight did in large part, is that they provided those telemarketing services to collect… A telemarketer calls him or some way, and then when does this prescription come out of all this? Does the telemarketer initiate that, or does the patient do that? The telemarketer would collect some basic information about the patients. For example, whether they had insurance was an important one, whether they were pregnant, whether they had seen a doctor within the last year. They would also collect the patient's medical history. That information would be sent to a doctor that the patient would never talk to personally, along with false information that the patient was interested in particular types of medicine, and that's where the prescription would be generated from. Thank you. Thank you. Mr. Buttle. Thank you, Your Honor. Just a few quick hits. Page 11569 is Judge Greer's ruling that this is not a medical necessity case. Page 7570 is the fact that Synergy and Dr. Bowles had no knowledge of a copay amount when these drugs were adjudicated by the PBMs. There is a Tennessee regulation that gets to your question, Judge Mathis, that makes it clear that a physician-patient relationship exists even when there's not an in-person encounter. And so the statute just says all that's required under 353B1 is a written prescription by a licensed doctor, which is what we have. But what the government's doing is trying to rewrite that statute and add a bona fide or valid requirement. Well, the statute says that asynchronous storm forward is a legitimate way for doctors to treat... I go back to the... I mean, courts have said that, for better or worse, that requirement is in the statute, right? A valid, bona fide prescription? I mean, I think the statute in Tennessee says it's valid, and I think the regulation that I just read makes it clear, and that regulation goes on to say that... It sure has to be a valid prescription. The idea that when the federal statutes say prescription, there's a requirement that it be bona fide, not just something that's written on a paper that says give this drug to this person. It's got to be bona fide, right? The only proof here is that it was a storm forward scenario, and that's legal under the Tennessee statute, and it's legal under the reg, and the reg goes further to say that it's the doctor's responsibility to ensure a valid engagement. And if it doesn't require an in-person encounter in the language of the reg and the language of the statute, then the government's left with nothing here. I mean, that's the point. There's no proof of materiality, separate and apart from... You're saying it's a valid prescription even though the patients didn't want these drugs, didn't know they were getting the drugs. At what point does it become a valid prescription? So it's valid because it's written by a doctor who's licensed in Tennessee in writing and provided to the pharmacy who fills the doctor's order with a valid product. Even though there's no doctor-patient relationship? There is a doctor-patient relationship according to the statute and the regs. It doesn't require an in-person encounter. It says that you can use storm forward technology, and that's the point. It's asynchronous. Did these patients know who their doctors were? Did these patients know who their doctors were? They didn't have a conversation with the doctor, but it's not required. But in addition to that, there's no materiality here because the claim form has a series of boxes to fill in that is filled in by the pharmacy, and none of the things that the government convicted Dr. Boas on are in that claim form. It's simply information that they claim they were deprived of, and that is not sufficient. Cleveland says those are concerns about allocation and exclusion and control of people who are on and off plant. And if you affirm these convictions, you make a pharmacist the guarantor of 50 states' regulatory compliance on an exchange that's upstream of them, and that is an over-criminalization problem. It's state regulatory law. It's breaches of contract. And Cleveland and Simonelli make it clear that you cannot stretch the federal mail fraud statutes to cover these sorts of things governed by civil and contract law or state regulatory law when there's no property. And here, there's no property crime. All you have is a plan to sell something in a valid exchange. It's just like Harrison. You're trying to get past the resistance of someone on their front porch to sell them a vacuum cleaner, or you're lying to Pfizer that your patients aren't addicts. You're telling them they're indigent to pay for real drugs. Tackle off. You bring in real patrons to buy real food and bev at the asking price by luring them in with models. That's a plan to buy and sell for real consideration, and that's the difference. Regency office supply in the Second Circuit is a plan to get past a battle act secretary who's protecting the executive and get in there and sell them real office supplies. None of those are federal crimes, and those are the four best cases we have. This is a plan to sell, and all we deprived them of was information of business compliance that was not property. Okay. Thank you, Counsel. Thank you. Thank you both for your briefs and arguments. The case will be submitted.